**STATE of Missouri, Respondent,**

v.

**Kirk R. RENFROW, Appellant.**

**No. WD 66102.**

Missouri Court of Appeals, Western District.

Feb. 27, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 1, 2007.

As Modified May 1, 2007.

Application for Transfer Denied June 26, 2007.

Thomas J. Keedy, Unionville, MO, for appellant.

Brenda Wall–Swedberg, Lancaster, MO, for respondent.

Before HOWARD, P.J., BRECKENRIDGE and HOLLIGER, JJ.

PATRICIA BRECKENRIDGE, Judge.

Kirk R. Renfrow appeals from a judgment of the trial court convicting him of driving while intoxicated, in violation of section 577.010, RSMo 2000.[1] In his sole point on appeal, Mr. Renfrow claims that the trial court erred in overruling his motion to suppress evidence of his intoxication because the evidence was the product of an illegal stop. Specifically, Mr. Renfrow claims that the stop was unlawful because the stop was conducted by a police officer outside of his jurisdiction, and not in fresh pursuit, as authorized under section 544.157. Because this court finds that the evidence of Mr. Renfrow's intoxication was obtained through the exploitation of his unlawful seizure, the trial court clearly erred in overruling Mr. Renfrow's motion to suppress. The judgment of the trial court is reversed and the cause is remanded with directions that the trial court sustain Mr. Renfrow's motion to suppress.

**Factual and Procedural Background**

In the early morning hours on February 19, 2005, Officer Jeffery Gottman, a part-time officer for the City of Lancaster, was traveling west within the city limits of Lancaster on U.S. Highway 136 in his city patrol car. As he approached the intersection of U.S. Highways 63 and 136, Officer Gottman observed a 1996 Black Ford Ranger pickup swerve across the centerline. As the pickup proceeded through the intersection across U.S. Highway 63 and onto State Highway 202 outside the city limits, Officer Gottman observed the pickup veer off the intersection onto the shoulder of the road. The pickup then shot back across the road, crossed the centerline, crossed back over the fog line, and started driving with one wheel on the gravel and the other on the highway. After Officer Gottman crossed U.S. Highway 63, he activated the emergency equipment on his vehicle and followed the pickup until it stopped. Because the centerline of U.S. Highway 63 is the city limits for the City of Lancaster, Officer Gottman was outside the city limits when he activated his emergency equipment and stopped the vehicle.

Officer Gottman approached the pickup and, when the driver rolled down the window, Officer Gottman could smell a strong odor of alcohol. Officer Gottman asked the driver to produce his driver's license, and Officer Gottman identified the driver as Mr. Renfrow. Officer Gottman then asked Mr. Renfrow to turn off his vehicle and to come sit with him in his vehicle. As Mr. Renfrow was walking to Officer Gottman's vehicle, Officer Gottman observed that Mr. Renfrow was staggering while he was walking. Once inside the vehicle, Officer Gottman contacted the Missouri State Highway Patrol to request that an officer come and administer a sobriety test. Officer Gottman explained to Mr. Renfrow that he was being detained. While they were sitting in Officer Gottman's vehicle, Mr. Renfrow admitted to Officer Gottman that he had been drinking at a bar. Officer Gottman informed Mr. Renfrow that when the Highway Patrolman arrived, he would perform a sobriety test and either arrest Mr. Renfrow for driving while intoxicated or allow him to go home. Officer Gottman also wrote a ticket citing Mr. Renfrow for failure to drive on the right half of the roadway.

At 2:40 A.M., Trooper Adam Kinney of the highway patrol arrived on the scene

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

and spoke with Officer Gottman. Officer Gottman explained to Trooper Kinney why he had stopped Mr. Renfrow and handed him Mr. Renfrow's driver's license. Trooper Kinney made contact with Mr. Renfrow while he was in the front passenger seat of Officer Gottman's patrol car and asked him to exit Officer Gottman's vehicle and have a seat in his vehicle. As Mr. Renfrow exited Officer Gottman's vehicle, Trooper Kinney observed that Mr. Renfrow had to steady himself on Officer Gottman's vehicle and that Mr. Renfrow was swaying as he was walking. When Trooper Kinney got inside of his vehicle with Mr. Renfrow, Trooper Kinney could smell the odor of intoxicants coming from Mr. Renfrow. Trooper Kinney asked Mr. Renfrow if he had been drinking and Mr. Renfrow said, "yes."

Trooper Kinney then administered a series of field sobriety tests while both inside and outside the vehicle. Trooper Kinney concluded from Mr. Renfrow's poor performance on the tests that he was intoxicated, so Trooper Kinney arrested Mr. Renfrow for driving while intoxicated. After Trooper Kinney arrested Mr. Renfrow, he was taken to the Schuyler County Jail to perform a breathalyzer test. At the county jail, Mr. Renfrow consented to the breathalyzer test and the results of the test indicated that Mr. Renfrow had a blood alcohol content of .134 percent.

The State charged Mr. Renfrow with driving while intoxicated under section 577.010. Prior to trial, Mr. Renfrow filed a motion to suppress evidence of his intoxication, asserting that the initial stop and detention was unlawful because it was made outside of Officer Gottman's jurisdiction. A bench trial was held on June 21, 2005, where the trial court heard and took Mr. Renfrow's motion to suppress under advisement. On August 22, 2005, the trial court found Mr. Renfrow guilty, beyond a reasonable doubt, of driving while intoxicated in violation of section 577.010. Mr. Renfrow filed this appeal.

## Standard of Review

■■■ " 'Review of a trial court's decision as to a motion to suppress evidence is limited to a determination of whether there is substantial evidence to support its decision.' " *State v. Wilson*, 169 S.W.3d 870, 875 (Mo.App. W.D.2005) (citation omitted). " 'The trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous.' " *Id.* (citation omitted). " 'The trial court's ruling is clearly erroneous if this court is left with a definite and firm belief a mistake has been made.' " *Id.* (citation omitted). " 'This court reviews the trial court's decision viewing the facts and reasonable inferences therefrom in the light most favorable to the trial court's order with the freedom to disregard contrary evidence and inferences.' " *Id.* (citation omitted).

## Error in Overruling Motion to Suppress

■■■ In his sole point on appeal, Mr. Renfrow asserts that the trial court erred in overruling his motion to suppress evidence of his intoxication because the evidence was the product of an illegal stop. Specifically, Mr. Renfrow claims that the stop was unlawful because the stop was conducted by a police officer outside of his jurisdiction when not in fresh pursuit under section 544.157.

■■■ "It is well established as a general rule that, in the absence of statute, municipal police officers have no official power to apprehend offenders beyond the boundaries of their municipality." *City of Advance v. Md. Cas. Co.*, 302 S.W.2d 28, 31–32 (Mo.1957). Although section 85.610 gives marshals of cities of the fourth class "power to make arrests without process, in

all cases in which any offenses against the laws of the city or of the state shall be committed in [their] presence," "[t]his section does not empower the marshal to make an arrest beyond the city limits." *Id.* (quoting section 85.610, RSMo 1949). An exception exits, however, where a law enforcement officer is in fresh pursuit of a person who has committed any criminal offense or violation of a municipal or county ordinance. Section 544.157.1. "Fresh pursuit" must be initiated from within the officer's jurisdiction and "imp[ies] instant pursuit." Sections 544.157.1, .3.

Mr. Renfrow relies on *City of Ash Grove v. Christian,* 949 S.W.2d 259 (Mo.App. S.D.1997), to support his claim that Officer Gottman was not in "fresh pursuit" when Officer Gottman stopped him outside of the city limits and, therefore, had no authority to make an arrest beyond the city limits. In *City of Ash Grove,* the defendant was arrested for diving while intoxicated in violation of a city ordinance by a city police officer outside the city limits. 949 S.W.2d at 260. While within the city limits, the officer observed the defendant speeding in his truck and " 'wandering within the traffic lane it was driving in.' " *Id.* The officer followed the truck, but did not activate his vehicle's emergency lights or siren within the city limits while following the truck. *Id.* After leaving the city limits, the defendant voluntarily stopped his vehicle on the shoulder of the road, and it was then that the officer activated his emergency equipment. *Id.*

After his conviction by the trial court, the defendant appealed and claimed his arrest violated section 544.157 because he was arrested outside the city limits by a city police officer who was not in fresh pursuit. *Id.* at 261. The court in *City of Ash Grove* stated the "crux of the instant case" centered "upon the definition of " 'fresh pursuit' " and then undertook a detailed analysis of the meaning of that term. *Id.* at 262–64. In defining "fresh pursuit," the court noted that section 544.157 was amended in 1993 and the definition was changed from "pursuit without unreasonable delay" to "instant pursuit." *Id.* at 262. In addition, the court found that because the legislature amended the statute, the amendment was presumed to have some effect and, therefore, found that "instant pursuit" "implies an attempt to apprehend or overtake in an immediate manner, without delay." *Id.* Thus, the court held that the 1993 amendment of section 544.157 expanded "on the immediacy of the concept of 'pursuit' by requiring 'instant' pursuit, as opposed to the more lax standard of 'pursuit without unreasonable delay.' " *Id.* at 263.

In addition, the court in *City of Ash Grove* discussed other criteria to be used in an analysis of fresh pursuit. *Id.* Specifically, the court found that in order "to show 'fresh pursuit' in accordance with the statutory mandate of section 544.157, police pursuit must be initiated within the peace officers' jurisdiction, must be immediate and without delay, consistent with reasonable police safety practices, and should be accompanied with a purpose to stop the vehicle." *Id.* at 264. In addition, there must be proof that the individual being sought is attempting to escape to avoid arrest or, at least, the individual must know that he is being pursued, which "may more easily be shown if the police utilize sirens and/or emergency lights in pursuance of a suspect." *Id.* at 263–64.

In analyzing the facts and circumstances in that case in light if the court's interpretation of "fresh pursuit," the court ultimately held that the officer was not engaged in "fresh pursuit" of the defendant prior to his arrest. *Id.* at 263–64. Specifically, the court found that there was no evidence that the defendant's method of

operating his vehicle through the city could be considered "'flight' to avoid apprehension." *Id.* at 263. The court also noted that the officer did not activate his sirens or emergency lights until he was outside the city limits. *Id.* at 264. Finally, the court found that the officer's "casual manner" of following the defendant through the community could not be considered "'instant pursuit'" or pursuit "without unnecessary or unreasonable delay." Id. Thus, the court held that because the officer was not engaged in "fresh pursuit," the evidence obtained during the defendant's arrest should have been suppressed because it was obtained pursuant to an unauthorized and illegal arrest. *Id.* at 264.

In this case, Officer Gottman observed Mr. Renfrow's pickup cross the centerline within the city limits. As Mr. Renfrow proceeded across the intersection onto State Highway 202, which was outside the city limits, Officer Gottman observed Mr. Renfrow's pickup veer off the intersection onto the shoulder of the road.[2] Officer Gottman also observed the pickup shoot back across the road, cross the centerline, cross back over the fog line, and then continue driving with one wheel on the gravel and the other on the highway. Like in *City of Ash Grove*, there was no evidence indicating that Mr. Renfrow was attempting to cross the city limit in order to avoid apprehension or arrest, or that Mr. Renfrow even knew that he was being pursued until after Officer Gottman activated his emergency equipment. Moreover, Officer Gottman did not activate his emergency equipment until after he was outside the city limits. Thus, this court agrees with Mr. Renfrow, that based on the holding in *City of Ash Grove*, Officer

Gottman was not in "fresh pursuit" and, therefore, did not have authority to stop Mr. Renfrow beyond the city limits of Lancaster.

 Mr. Renfrow further asserts that the stop by Officer Gottman was a "seizure" and, therefore, constitutes an illegal stop. He is correct. "Stopping a motor vehicle and detaining its occupant[ ] for an alleged traffic violation constitutes a seizure within the meaning of the Fourth Amendment." *State v. Taber*, 73 S.W.3d 699, 705 (Mo.App. W.D.2002). Therefore, because Officer Gottman was not in fresh pursuit and did not have authority to stop Mr. Renfrow outside the city limits, the stopping and detention of Mr. Renfrow was an unlawful seizure.

The inquiry does not end there, however. *State v. Neher*, 726 S.W.2d 362, 364 (Mo.App. W.D.1987). There is the additional consideration of "whether the subsequent and second arrest by Trooper [Kinney] was tainted by the unlawful [seizure] by [O]fficer [Gottman], as to amount to 'fruit of the poisonous tree' under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), so as to make the evidence subsequently ascertained by Trooper [Kinney] subject to [Mr. Renfrow's] motion to suppress it." *Id.*

 "Generally, evidence discovered and later found to be derivative of a Fourth Amendment violation must be excluded as fruit of the poisonous tree." *State v. Miller*, 894 S.W.2d 649, 654 (Mo. banc 1995). "However, there is no steadfast rule that evidence discovered after a Fourth Amendment violation must be excluded." *Id.* "Instead, '[i]n determining whether the exclusionary rule should apply to render evidence inadmissible as "fruit of

---

**2.** Mr. Renfrow's vehicle would have been through the intersection, and outside the city limits, when Officer Gottman observed it veer onto the shoulder of the road because there is no shoulder within the intersection.

the poisonous tree," the question is "whether, granting establishment of the primary illegality, the evidence to which . . . objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' " *Id.* (citations omitted).

Three doctrines or rules are used to determine whether there are " ' "means sufficiently distinguishable to be purged of the primary taint" ' ": the attenuation doctrine, the independent source rule, and the inevitable discovery rule. *Id.* at n. 5 (citations omitted). "The independent source rule provides that facts obtained by illegal police misconduct may be admissible if knowledge of the facts can be proved through a source independent of the illegality." *Id.* Under the attenuation doctrine, three factors are considered: "(1) the temporal proximity of the illegality and the [unlawful activity]; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.* at 655. Finally, "[t]he inevitable discovery rule provides that information obtained through an unlawful search may be admissible if it is shown that such evidence would have been discovered even if the illegality had not occurred." *Id.* at 654 n. 5.

The State argues that this court has previously addressed, in a case directly on point with the facts of this case, whether evidence obtained after an illegal stop outside an officer's jurisdiction is fruit of the poisonous tree and inadmissible. *Neher*, 726 S.W.2d 362. In *Neher*, the defendant was convicted of driving while intoxicated in violation of section 577.010. 726 S.W.2d at 363. Inside the city limits, two city police officers observed the defendant cross the centerline, causing a car to pull off of the highway. *Id.* As the defendant was leaving the city limits, another car was forced to pull off of the highway. *Id.* The city police officers began following the vehicle and notified the county sheriff's department and asked for a trooper. *Id.* At that time, a trooper was not available, but the county sheriff later instructed the city police officers to stop the vehicle to get it off the highway. *Id.* The city police officers then activated the emergency equipment on the patrol car and stopped the vehicle. *Id.*

After one of the officers approached the vehicle and the defendant rolled down his window, the officer noticed "a very heavy odor of alcohol." *Id.* The officer informed the defendant that he was a city police officer and that a trooper was on the way. *Id.* The defendant was asked to remain in his vehicle until the trooper arrived because of his "erratic driving." *Id.* After the defendant produced his driver's license, the officer took his license and kept it until the trooper arrived. *Id.* The officer did not place the defendant under arrest or issue any citations. *Id.*

When the trooper arrived, he asked the defendant to step out of the vehicle. *Id.* The defendant was not able to stand up without stumbling and holding on to his vehicle. *Id.* While the defendant was proceeding to the trooper's patrol car, he was unstable on his feet and the trooper had to reach for the defendant's arm. *Id.* The trooper also noticed a strong odor of alcohol on the defendant. *Id.* Sobriety tests were not conducted until they arrived at the sheriff's office because the defendant was so unstable. *Id.* The results of the test led the trooper to believe that the defendant was intoxicated. *Id.* A breathalyzer test was conducted and showed that the defendant had a blood alcohol content of .27 percent. *Id.*

After his conviction by the trial court, the defendant appealed alleging that "the trial court erred in overruling his motion

to suppress evidence of his intoxication because it was the product of an illegal arrest in that it was done by a fourth class city police officer outside his jurisdiction." *Id.* This court found that under the facts of the case the stop of the defendant was an unlawful arrest and that because the officer "had no authority to make arrests beyond the city limits of Norborne, the stopping and detention of [the defendant] was unlawful." *Id.* at 364. Ultimately, however, this court held that because the trooper who arrested the defendant obtained the evidence of the defendant's intoxication during an independent investigation, the evidence of the defendant's intoxication was not discovered through an exploitation of the first arrest and, therefore, the trial court properly overruled the defendant's motion to suppress the trooper's testimony. *Id.* at 364–65.

Although the facts of *Neher* are directly on point, this court finds that its conclusion is contrary to that required by the independent source rule and the attenuation doctrine, and the case should be overruled.[3] "If the independent source is found to exist, or in fact comes into existence after the initial illegality, then it must be carefully examined in order to prevent the independent source requirement from becoming an 'illusory source requirement.'" Robert M. Pitler, *"The Fruit of the Poisonous Tree" Revisited & Shepardized*, 56 CAL. L.REV. 579, 626 (1968) (discussing the independent source rule as an exception to the exclusionary rule). "The independent source must be closely scrutinized to ascertain whether the alleged source has, in fact, been discovered by independent means or whether the independent source, in fact, owes its very discovery to illicit means." *Id.* at 627. The evidence in question must be obtained "from a source separate and distinct from its own illegal activity." *Id.* at 593.

Applying these principles, Missouri courts have found an exception to the fruit of the poisonous tree doctrine under the independent source rule only where the source is entirely separate and distinct from the primary illegality. *See State v. Thomas*, 491 S.W.2d 328, 331 (Mo.1973) (lineup identification by robbery victim independent of unlawful arrest where identification based on witnesses' recollections and observations at the time of the robbery); *State v. Reasonover*, 700 S.W.2d 178, 183 (Mo.App. E.D.1985) (same); *State v. Lynch*, 528 S.W.2d 454, 459–60 (Mo.App. 1975) (same). In this case, Trooper Kinney's investigation was initiated pursuant to Officer Gottman's contact with the Highway Patrol and Officer Gottman's explanation as to why he had detained Mr. Renfrow. Trooper Kinney's investigation was a mere extension of Mr. Renfrow's unlawful seizure and was not based on independent information. Where, as here, the unlawful seizure and lawful arrest are so inextricably intertwined, it cannot be said that the evidence of Mr. Renfrow's intoxication was obtained from a source "separate and distinct" from the initial unlawful seizure.

Nor does the attenuation rule provide an exception to the fruit of the poisonous tree doctrine in this case. Trooper Kinney's investigation and subsequent arrest of Mr. Renfrow is not sufficiently attenuated from Officer Gottman's initial

---

3. In reaching its conclusion, the court in *Neher* relied upon *Settle v. State*, 679 S.W.2d 310, 320 (Mo.App. W.D.1984), which found that because there was no independent investigation by the intervening officers, the officers' intervention did not purge the taint of the initial unlawful detention. Anything in *Settle* that can be read to be contrary to the holding of this case is likewise overruled.

unlawful activity. As stated above, three factors are considered in applying the attenuation doctrine: "(1) the temporal proximity of the illegality and the [unlawful activity]; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Miller*, 894 S.W.2d at 655. Although Officer Gottman's and Trooper Kinney's misconduct was not flagrant, due to the proximity of the events and the fact that there were no intervening circumstances between Officer Gottman's initial unlawful seizure and Trooper Kinney's investigation and subsequent arrest of Mr. Renfrow, the evidence of Mr. Renfrow's intoxication was not obtained through a means sufficiently distinguishable to be purged of any taint. *Id.* at 654.

Finally, the inevitable discovery rule also does not provide an exception to the fruit of the poisonous tree doctrine in this case. Under this doctrine, " 'where law enforcement personnel would ultimately or inevitable have discovered evidence, the evidence is admissible notwithstanding a constitutionally invalid search [or seizure].' " *State v. Coyne*, 112 S.W.3d 439, 443 (Mo.App.E.D.2003) (citation omitted). Illegally seized evidence under the inevitable discovery rule, however, is only admissible "where the state proves by a preponderance of the evidence that certain standard procedures of the local police would have been utilized and that those procedures would have resulted in the inevitable discovery of the challenged evidence." *Id.* Moreover, evidence of local police department standard procedures "cannot involve speculation, and it must be focused upon demonstrated facts which are capable of verification and impeachment." *Id.* Here, the State presented no evidence regarding any local police department procedures, much less evidence that those procedures would have been utilized in this case. Consequently, evidence of Mr. Renfrow's intoxication was not admissible under the inevitable discovery doctrine.

In sum, evidence of Mr. Renfrow's intoxication was obtained through the exploitation of Officer Gottman's illegal arrest, and there is no applicable exception to the fruit of the poisonous tree doctrine to purge the taint of the primary illegality. Consequently, the trial court clearly erred in overruling Mr. Renfrow's motion to suppress. Accordingly, the judgment of the trial court is reversed and the cause is remanded with directions for the trial court to sustain Mr. Renfrow's motion to suppress.

All concur.